**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                                            )
                                                               )
              Plaintiff,               )
                                                               )          Civil Action No. 10-1284
        v.                                   )          Judge Nora Barry Fischer
                                                               )
UNITED STATES STEEL CORPORATION          )
and UNITED STEEL, PAPER &                         )
FORESTRY, RUBBER,                                    )
MANUFACTURING, ENERGY, ALLIED          )
INDUSTRIAL, AND SERVICE WORKERS          )
INTERNATIONAL UNION, AFL-CIO,               )
                                                               )
             Defendants.            )

## <u>MEMORANDUM OPINION</u>

The Equal Employment Opportunity Commission ("EEOC") initiated this Americans with Disabilities Act ("ADA") action on behalf of charging party Abigail DeSimone and all similarly situated employees of Defendant U.S. Steel ("U.S. Steel"). At issue is U.S. Steel's practice of conducting random drug and alcohol testing on its probationary employees. The EEOC contends that such testing violates 42 U.S.C. § 12112(d)(4)(A), which prohibits medical examinations that are not "job-related and consistent with business necessity." Pending before the Court is U.S. Steel's Motion for Summary Judgment. (Docket No. 227). U.S. Steel contends dismissal is warranted because: (1) the EEOC failed to complete the multistep enforcement procedure prior to bringing the lawsuit; (2) the practice of randomly testing probationary employees is job-related and consistent with business necessity; (3) the enforcement guideline on which the EEOC attempts to rely for legal support is not the kind of administrative material that deserves any judicial deference; (4) the subject testing policy is part of a voluntary health and safety program negotiated by the United Steelworkers of America, AFL-CIO ("USW") and

accepted by individual employees at the beginning of their employment; and (5) the testing policy is necessitated by the company's obligations under federal law.

The EEOC countered with a brief opposing summary judgment, contesting every point raised in U.S. Steel's summary judgment motion and supporting brief. (Docket No. 248). Reply and sur-reply briefings were also filed by the parties. (Docket Nos. 254; 258). The Court then heard arguments from counsel at a summary judgment hearing held on November 16, 2012. (Docket No. 261). Following the hearing, the parties filed another round of supplemental briefings. (Docket Nos. 262; 263). Upon consideration of the voluminous filings on this matter and the parties' oral arguments at the November 16, 2012 hearing, U.S. Steel's motion for summary judgment is granted and this action is dismissed.

## I.  FACTUAL BACKGROUND[1]

U.S. Steel conducts random drug and alcohol testing on its probationary employees in accordance with the terms and conditions of the Basic Labor Agreement ("BLA") between U.S.

---

[1] In support of the summary judgment motion, U.S. Steel has produced a "Concise Statement of Undisputed Material Facts" containing a number of declarations and documents describing the work environment at the Clairton Coke Plant as well as the alcohol and drug testing policy at issue. (Docket Nos. 229; 230). Pursuant to Local Rule56(C)(1)(a), the EEOC was obligated to submit a separately filed concise statement "admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material." The EEOC filed a response wherein it failed to either admit or deny seventy-nine of the eighty-three factual statements listed in U.S. Steel's "Concise Statement of Undisputed Material Facts." (Docket No. 249). This Court "requires strict compliance with the provisions of [Local Rule 56]." *Practices and Procedures of Judge Nora Barry Fischer § II.E.(i), Effective March 23, 2010, available at* http://www.pawd.uscourts.gov/Documents/ Judge/fischer_pp.pdf. To the extent that the EEOC fails to either admit or deny these facts, they will be deemed admitted. *See* W.D. Pa. L.R. 56.1(E) ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts ..., which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted <u>unless specifically denied or otherwise controverted by separate concise statement of the opposing party</u>.") (emphasis added); *see also Janokowski v. Demand*, No. 06-618, 2008 WL 1901347, at *1 (W.D. Pa. Apr. 25, 2008) (unpublished) (defendant's statement of material facts were deemed admitted for summary judgment purposes because plaintiff violated Local Rule 56.1(c)); *GNC Franchising LLC v. Kahn*, Nos. 05-1341, 06-238, 2008 WL 61274, at *1 (W.D. Pa. Mar. 3, 2008) (unpublished) (facts set forth in plaintiff's statement of facts were deemed admitted due to defendant's violation of Rule 56.1(E)); *Ferace v. Hawley*, No. 05-1259, 2007 WL 2823477, at *1 (W.D. Pa. Sept. 26, 2007) (unpublished) (citing *Benko v. Portage Area Sch. Dist.*, No. 03-233J, 2006 WL 1698317 (W.D. Pa. June 19, 2006)); *Practices and Procedures of Judge Nora Barry Fischer* § II(E)(ii) ("Every party opposing a Motion for Summary Judgment shall file in addition to its brief in opposition, a response to the moving party's statement of material facts not in dispute... For any disputed fact, the opposing party shall cite to evidentiary material demonstrating the dispute and attach such evidentiary material to its response.").

Steel and the USW, a party to this litigation.  (Docket No. 3, at ¶ 15).  Probationary employees who produce a positive test result are discharged.  *Id.*

One such discharged employee was Plaintiff-Intervenor Abigail DeSimone, whom U.S. Steel hired on January 14, 2008 at its facility in Clairton, Pennsylvania.  *Id.* at ¶ 13(a).  Ms. DeSimone submitted to a breath alcohol test on January 29, 2008, which indicated the presence of alcohol.  *Id.* at ¶ 13(b) & (c).  Despite her protests that the positive test result was attributable to her diabetic condition, U.S. Steel terminated her employment on February 7, 2008.  *Id.* at ¶ 13. The EEOC initially filed suit seeking relief for Ms. DeSimone and a class of unidentified aggrieved employees.  *Id.* at 8 ¶ E.  However, Ms. DeSimone has since settled her individual case with U.S. Steel.  (Docket No. 192).

## A.  Drug and Alcohol Testing at the Clairton Coke Plant

The U.S. Steel coke manufacturing facility at Clairton is the largest coke production plant in the United States.   (Docket No. 230-1, at 2).   The Clairton plant consists of several departments, the largest of which is the Coke Production Department.  *Id.* at 3.  Employees at the Coke Production Department produce coke by heating metallurgical coal inside airless coke oven batteries.  *Id.* at 3.  New entry-level hires are generally assigned to said department and must qualify to perform three functions as designated UP1 employees:  Door Cleaner, Lidman, and Coke Oven Laborer.  *Id.* at 3-4.

Door Cleaners, Lidmen, and Coke Oven Laborers work on or very near the coke batteries, which contain molten coke and can reach a temperature of up to 2,100 degrees Fahrenheit.  *Id.* at 4-8.   Other hazards these employees face include narrow work areas, dangerous heights, massive moving machinery, superheated gasses that are both toxic and combustible, biosludge, as well as a number of mobile vehicles containing hot coke or

bituminous coal, such as Hot Cars and Larry Cars. *Id.* at 4-8, 11-12. Because of the hazardous working conditions, UP1 employees are required to don layers of protective clothing, equipment, and masks that cover the entire body. *Id.* at 12-14; (Docket No. 230-9, at 3-10; Docket No. 230-10, at 3-9). New employees may also work as Laborers in the Screening Station when there is a shortage of employees. (Docket No. 230-1, at 8). The functions performed by these Laborers involve operating the in-plant locomotives or loading coke into the railroad cars. *Id.*

The approximately 1,250 employees at the Clairton plant are represented by the USW. (Docket No. 230-11, at 2-3). In accordance with the terms of the BLA negotiated between U.S. Steel and the USW, new employees must successfully complete a probationary period of 1,040 hours. *Id.* at 3. The BLA further stipulates that U.S. Steel may subject its probationary employees to drug and alcohol testing[2]:

> 1. The Parties desire a drug and alcohol free workplace....
>
> 2. ... The Company may require Employees in their probationary
>    to submit to periodic drug and alcohol testing....

*Id.* at 4; (Docket No. 230-12, at 20). Newly hired employees are given the BLA at orientation and must sign an acknowledgement of their "obligation to maintain a safe and healthy workplace free from the devastating effects of alcohol and other drugs." (Docket No. 230-25, at ¶¶ 6, 8). The alcohol and drug testing program contemplated by this BLA was in effect at all relevant times—indeed, both U.S. Steel and USW agreed to a substantially similar provision in negotiations for the 2012 BLA. (Docket No. 230-20, at 3, 164).

---

[2] The practice of randomly testing probationary employees for drugs and alcohol began at U.S. Steel's facility in Gary, Indiana. (Docket No. 230-11, at 4). As clarified at the hearing, the Gary Works plant had experienced difficulties with workers going to work impaired by drugs and alcohol. U.S. Steel's counsel represented that this difficulty was partially attributable to the inability of supervisors to detect and identify intoxicated employees through heavy layers of protective equipment.

In practice, probationary employees at the Clairton plant are tested on a random basis. (Docket No. 230-25, at 4-5).  Drug and alcohol testing of Clairton plant employees is conducted by medical staff at the Mon Valley Works Medical Department ("MVW Medical Department"). *Id.* at 4.  During the relevant time period, the medical staff performing the tests was employed by Jefferson Regional Medical Center ("Jefferson Regional") and was certified to administer breathalyzer tests.  *Id.*  Only positive test results were reported to U.S. Steel.  *Id.*

**B.  The EEOC's Pre-Suit Investigation**

On January 29, 2008, Ms. DeSimone was terminated after she failed both an initial and a confirmatory breath alcohol test.  *Id.* at 4-5.  She submitted her disability discrimination charge to the EEOC on April 21, 2008.  (Docket No. 248-1, at 10-11).  Soon thereafter, Paul Southworth, an investigator with the EEOC's Pittsburgh Area Office, conducted an investigation into the charge.  *Id.* at 2.  As part of this investigation, U.S. Steel representative Todd Seitz provided a position statement, which included selected pages from its BLA pertaining to the periodic drug and alcohol testing policy for probationary employees.  *Id.* at 13-15.  After reviewing this position statement, Mr. Southworth requested additional information on the breath testing machine used, the identification of all probationary employees at U.S. Steel's Clairton plant during that relevant time period, the corporation's alcohol testing policies and procedures, as well as an additional request that U.S. Steel explain whether its alcohol testing policy for probationary employees was a "corporate-wide practice."[3]  *Id.* at 3-4.  In response, U.S. Steel submitted documents relating to the testing machines, identified the personnel involved in administering the test and deciding whether to terminate Ms. DeSimone, disclosed a "Policy Manual" concerning its "Alcohol and Drug Free Workplace," and provided a list of 150

---

[3] The initial request for information was sent on April 20, 2009.  (Docket No. 248-1, at 17).  A revised request was sent on May 6, 2009.  *Id.* at 20.

probationary employees, identified only by number, who were subjected to an alcohol breath test since January 1, 2007. *Id.* at 4-5; (Docket No. 248-2, at 3-10). U.S. Steel further admitted that both the BLA and the alcohol testing policy apply company-wide. (Docket No. 248-1, at 4, 26).

On June 26, 2009, Mr. Southworth again requested additional information about these and other employees who had been subjected to the alcohol breath test. *Id.* at 5; (Docket No. 248-2, at 22). Some of these employees had already been identified by Ms. DeSimone. (Docket No. 248-1, at 5). U.S. Steel responded with the requested information on July 23, 2009, indicating that three other employees had been terminated for testing positive for drugs or alcohol. (Docket No. 248-1, at 5; Docket No. 248-2, at 25). In this round of responses, it was revealed that one other probationary employee had produced a positive initial breath test but was not discharged after a follow-up exam yielded a negative result. (Docket No. 248-1, at 5; Docket No. 248-2, at 26-27).

Aside from the names of employees provided by Ms. DeSimone, Mr. Southworth was unable to identify by name any probationary employees who were subjected to the drug and alcohol testing policy. (Docket No. 248-1, at 7). He decided not to pursue this information because he "did not need the names of these employees to recommend a case finding, since they could be identified later." *Id.*

Mr. Seitz confirms that the EEOC never sought more specific or additional information than what was contained in the aforementioned correspondence. (Docket No. 230-20, at 4). Moreover, Mr. Seitz affirms that the EEOC did not request any information about employees at other U.S. Steel locations, nor did it subpoena witness testimony from U.S. Steel or from U.S. Steel employees working outside of Clairton. *Id.* The EEOC also omitted to ask about the

reasons for U.S. Steel's alcohol testing policy and never visited any U.S. Steel facility during the investigation.  *Id.*

### C.  The Reasonable Cause Determination

On April 5, 2010, Mr. Southworth sent a pre-determination letter ("PDL") to U.S. Steel. (Docket No. 248-2, at 31).   The PDL letter informed U.S. Steel that he had completed the investigation of Ms. DeSimone's charge and was recommending "that the EEOC find [U.S. Steel] in violation of the ADA with respect to the alcohol testing of probationary employees as a class."  *Id.* at 32.   This recommendation was based on his opinion that "[U.S. Steel] had no reasonable belief that [Ms. DeSimone] was under the influence of alcohol at work."  *Id.*   The PDL also stated that "the investigation reveals that probationary employees as a class covered by the 2003 [BLA] between U.S. Steel ... and the United Steelworkers were administered the alcohol testing with no reasonable belief of being under the influence."  *Id.*   As Mr. Southworth later averred, he was guided by the principle that "an employer must have objective evidence that an employee either cannot perform the essential functions of the job or poses a direct threat in order to subject the employee to a medical examination or inquiry."  (Docket No. 248-1, at 7).

U.S. Steel responded with a letter on April 16, 2010, explaining that steel and coke manufacturing facilities "present a wide range of potential exposures that can cause injury" and that "[i]mpairment by drugs or alcohol increases the potential for accidents and injury, both for the impaired person and those working near him or her."  (Docket No. 248-2, at 34).   The company asserted:

> The probationary period established by the BLA provides the Company with the opportunity to ascertain whether a new employee can perform the work in a satisfactory manner and whether he or she is willing and able to comply with the Company's rules, policies and procedures, particularly those pertaining to safety.  The Alcohol and Drug Free Workplace policy

is among the most important of our policies because of its direct
connection to safety.

*Id.*   U.S. Steel also declared that "it should be evident that periodic unannounced drug and

alcohol testing of new employees during their probationary period is job-related, consistent with

business necessity, and non-discriminatory" and opined that "[n]o responsible employer in heavy

industry would retain [Ms. DeSimone because she failed the alcohol test]."   *Id.* at 35.

The EEOC adopted Mr. Southworth's reasonable cause recommendation.   A reasonable

cause determination was then issued in the form of a Letter of Determination ("LOD").

### D.  The Conciliation Effort

Following the Court's order dated October 15, 2012, (Docket No. 245), the EEOC has

not provided the LOD or any documents relating to its confidential conciliation efforts with U.S.

Steel.[4]   Given the considerable motions practice relating to the release of these confidential

conciliation documents, however, the Court is aware that an unsuccessful effort at conciliation

was made prior to litigation.   *See E.E.O.C. v. U.S. Steel Corp.*, No. 10-1284, 2012 WL 1150799

(W.D. Pa. Apr. 5, 2012) (unpublished).   Mr. Seitz has also represented that U.S. Steel was never

provided specific information about the individuals of the aggrieved class of claimants, nor did

the EEOC inform the corporation about the U.S. Steel plant or plants it believed was not in

compliance with the law.   (Docket No. 230-20, at 5).   Aside from the procedural history and Mr.

Seitz's assertions, the exact details of the conciliation attempt remain unknown to the Court.

---

[4] Among the documents that have been omitted is the LOD.  The Court had previously excluded the LOD
from the record by an order dated September 30, 2011, (Docket No. 118), which adopted Special Master Sally
Griffith Cimini's recommendation that the LOD constituted a confidential conciliation document.  (Docket Nos. 82;
101; 103).

## II.      PROCEDURAL BACKGROUND

The EEOC initiated this action against U.S. Steel and the USW on September 30, 2010, (Docket No. 1), and then filed its only Amended Complaint on October 13, 2010.  (Docket No. 3).  Ms. DeSimone intervened in this litigation on November 2, 2010.  (Docket No. 13).

On January 4, 2011, U.S. Steel filed a Motion to Dismiss.  (Docket No. 23).  The Court held an initial case management conference on February 3, 2011.  (Docket No. 28).  In the following case management order issued on February 24, 2011, the Court directed that discovery as to Ms. DeSimone's claims was to commence immediately.  (Docket No. 44, at 1-2).  To that end, the Court authorized the deposition of Ms. DeSimone, her husband, certain male employees who were allegedly retained despite testing positive for alcohol, U.S. Steel employees involved in the formulation and administration of drug and alcohol testing policies during the relevant time period, and the employees involved in the hiring and firing of Ms. DeSimone.  *Id.* at 2.  As to projected class discovery, the Court ordered that U.S. Steel disclose the identities and records of probationary employees nationwide who were terminated for having positive breath alcohol tests within forty-five days of the Court's ruling on the then-pending Motion to Dismiss.  *Id.* at 3.  Finally, the Court reserved the ability to revisit the parties' filings and issue an amended case management order to address any remaining discovery issues after disposing of the Motion to Dismiss.  *Id.*

On March 1, 2011, the EEOC filed a brief opposing U.S. Steel's Motion to Dismiss, but included confidential conciliation documents therein.  (Docket No. 49).  Consequently, U.S. Steel responded with a Motion for Expedited Relief on March 4, 2011, objecting to the EEOC's attachment of the confidential conciliation documents.  (Docket No. 53).  The issues surrounding the confidential conciliation documents were later resolved with the assistance of Special Master

Sally Griffith Cimini, as noted above (Docket Nos. 118; 196), and the Court denied U.S. Steel's request for attorneys' fees and costs, without prejudice.  (Docket Nos. 218; 219).

On February 9, 2012, U.S. Steel sought summary judgment against Ms. DeSimone, arguing that: (1) its random alcohol breath testing practice is lawful under the ADA; (2) her disability discrimination and failure to accommodate claims lacked merit; and (3) she could not establish a retaliation claim because there is no evidence of a causal connection between her allegedly protected activity and her termination.  (Docket Nos. 178; 179).  With respect to the contention that its alcohol tests did not violate the ADA, the company maintained that: (1) the policy was job-related and consistent with business necessity; (2) the policy is part of a voluntary health and safety program negotiated with and agreed to by the employees' bargaining representative and accepted by individual employees at the outset of their employment; and (3) the policy is necessitated by U.S. Steel's obligations under federal safety and environmental laws and regulations.  (Docket No. 179, at 5).  Before responding, Ms. DeSimone settled her claims.  (Docket No. 192).

U.S. Steel filed a Renewed Motion to Dismiss as to the EEOC's complaint on May 9, 2012.  (Docket No. 205).  Following briefing, the Court granted this motion with prejudice as to all claims of discrimination based on alcohol breath tests and/or termination that occurred before August 10, 2007, and denied this motion without prejudice in all other respects.  (Docket No. 221).

U.S. Steel's instant Motion for Summary Judgment followed soon thereafter on September 14, 2012.  (Docket No. 227).  With respect to the claim that the random alcohol tests did not violate the ADA, the brief in support incorporates[5] arguments previously used in U.S.

---

[5] A side-by-side comparison of selected portions of the two motions for summary judgment reveals that many of the arguments are word-for-word identical.  *Compare* (Docket No. 179) with (Docket No. 228).

Steel's motion for summary judgment against Ms. DeSimone by again asserting that: (1) the policy was job-related and consistent with business necessity; (2) the policy is part of a voluntary health and safety program negotiated with and agreed to by the employees' bargaining representative and accepted by individual employees at the outset of their employment; and (3) the policy is necessitated by U.S. Steel's obligations under federal safety and environmental laws and regulations.  (Docket No. 228, at 11).

The EEOC filed a response on October 16, 2012, opposing summary judgment.[6]  (Docket Nos. 248; 249).  On October 30, 2012, U.S. Steel submitted its reply to the EEOC's summary judgment response.  (Docket No. 254).  The EEOC filed a sur-reply on November 13, 2012. (Docket No. 258).  A motion hearing on this matter was held on November 17, 2012.  Following supplemental briefings, (Docket Nos. 262; 263), this matter is now ripe for disposition.

## III.    LEGAL STANDARD

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the

---

[6] A status conference was convened on September 24, 2012, wherein it was revealed that the EEOC had not conducted sufficient investigation or discovery into the alcohol and drug policy at issue to adequately oppose U.S. Steel's request for summary judgment.  *See* (Docket No. 233).  From the representations of EEOC's counsel, the agency lacked information about the creation and implementation of the policy, the types of machines used during the testing, training and testing protocols, scientific analysis relating to the accuracy of the testing, the effectiveness of the policy, the way in which it was implemented, and onsite inspection data.  In short, it appeared that throughout the litigation, the EEOC was laboring under the impression that it could not seek discovery on shared issues involving both DeSimone and the class claims.  This information gap was confirmed in the EEOC's Rule 56(d) motion, wherein the agency reiterated the need for additional discovery on the aforementioned matters.  (Docket No. 235-1, at 2-7).  Yet, the record reflects that former EEOC counsel, Jean Clickner, participated and took the lead in conducting certain depositions.  *See* (Docket No. 241-6, at 4-5) (Ms. Clickner purporting to be Mrs. DeSimone's counsel at a June 15, 2011 deposition).  Upon the filing of EEOC's response opposing summary judgment, (Docket Nos. 248; 249), the Rule 56(d) motion was denied as moot on October 17, 2012.

evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine dispute of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine dispute of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

IV.   **DISCUSSION**

As a threshold matter, Defendant U.S. Steel argues that the class claims should be dismissed because the EEOC failed to comply with Title VII's multistep enforcement procedure

before it filed the present suit.  (Docket No. 228, at 20).[7]  On the merits, U.S. Steel defends the legality of its random alcohol breath test policy on four bases: (1) the policy was job-related and consistent with business necessity; (2) the sub-regulatory guidance on which the EEOC relies deserves no judicial deference; (3) the policy is part of a voluntary health and safety program negotiated with and agreed to by the employees' bargaining representative and accepted by individual employees at the outset of their employment; and (4) the policy is necessitated by U.S. Steel's obligations under federal safety and environmental laws and regulations.  *Id.* at 11.

### A.  Compliance With Title VII Multistep Enforcement Procedures

Because U.S. Steel argues that the EEOC's failure to satisfy the Title VII multistep enforcement procedures provides an independent basis for dismissal regardless of the merits, the Court addresses this issue first.  The EEOC is authorized to bring civil suits to enforce Title VII. *Occidental Life Ins. Co. v. E.E.O.C.*, 432 U.S. 355, 358-59 (1977).  "When EEOC sues in its own name, it may litigate only those claims which have been subjected to the complete administrative processing required by Title VII."  *EEOC v. E. Hills Ford Sales, Inc.*, 445 F. Supp. 985, 987 (W.D. Pa. 1978).  Before it can initiate a civil suit, Title VII requires the EEOC to: (1) receive a charge from an individual and notify the employer of the charge, (2) investigate that charge and related charges, (3) determine that "reasonable cause" exists to believe that discrimination occurred, and (4) attempt conciliation of all charges against the employer.  *See* 42 U.S.C. § 2000e-5(b).  "Only after the EEOC determines that it has been unable to secure from a respondent a satisfactory conciliation agreement may it bring a civil action."  *E.E.O.C. v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 73 (3d Cir. 1984) (citing 42 U.S.C. § 2000e-5(f)(1)).  Hence, every step in the statutory scheme, including notice, investigation, determination, and

---

[7] While U.S. Steel does not concede that the subject alcohol breath test constitutes a "medical examination" within the meaning of the ADA, (Docket No. 228, at 11 n.2), it has not provided any argument to the contrary.

conciliation "is intended to be a condition precedent to the following step and, ultimately, to suit." *E.E.O.C. v. Allegheny Airlines*, 436 F. Supp. 1300, 1304 (W.D. Pa. 1977) (citing *EEOC v. E. I. Dupont de Nemours and Co.*, 373 F. Supp. 1321 (D. Del. 1974)); *see also EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 (5th Cir. 2009) (the EEOC's conciliation requirement is a precondition to suit).

The way in which the EEOC conducts its investigation, reasonable cause determination, and conciliation attempt is generally left to the agency's discretion. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002) ("[Title VII] makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake."); *EEOC v. Keco Indus. Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984) ("The form and substance of those conciliations is within the discretion of the EEOC as the agency created to administer and enforce our employment discrimination laws and is beyond judicial review.").  Moreover, the EEOC is not limited to litigating over matters presented in a charge—it may seek relief for any violations that it "ascertains in the course of a reasonable investigation of a charging party's complaint."  *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331 (1980) (citations omitted); *see also EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005) ("The charge incites the investigation, but if the investigation turns up additional violations, the Commission can add them to its suit.").

Nevertheless, the EEOC's failure to comply with these pre-suit obligations warrants dismissal of charges that did not receive adequate attention by the agency. *See EEOC v. CRST Van Expedited, Inc.* ("*CRST II*"), 679 F.3d 657, 677 (8th Cir. 2012) (affirming dismissal of an entire action because the EEOC "wholly failed to satisfy" Title VII's pre-suit requirements); *Keco Indus. Inc.*, 748 F.2d at 1100 (directing district courts to "only determine whether the

EEOC made an attempt at conciliation" in the context of a challenge regarding the sufficiency of the EEOC's conciliation attempt); *E. Hills Ford Sales*, 445 F. Supp. at 988-89 (lawsuit was jurisdictionally limited to the single claim of violation by the charging party because the EEOC did not investigate or conciliate any other person's claim); *EEOC v. Am. Home Prods. Corp.*, 165 F. Supp. 2d 886, 914 (N.D. Iowa 2001) (EEOC's failure to make a pre-suit "reasonable cause" determination with regard to post-release retaliation practices, as opposed to a single instance of retaliation, precluded the agency from bringing the retaliatory practices claim).  Even where the EEOC has fulfilled its statutory enforcement obligations on paper, some courts have still undertaken an analysis into the quality and sufficiency of the agency's pre-suit activities. For example, if the agency's obligatory pre-suit activities failed to put the employer on notice about the national scope of the contemplated litigation, the scope of the EEOC's claims may be limited.  *See EEOC v. Dillard's Inc.*, No. 08-CV-1780, 2011 WL 2784516, at *8 (S.D. Cal. July 14, 2011) (unpublished) (EEOC's failure to inquire as to employees located in different stores foreclosed recovery on behalf of a nationwide class despite pre-suit communications to defendant referring to "similarly-situated" individuals); *EEOC v. Jillian's of Indianapolis, IN, Inc.*, 279 F. Supp. 2d 974, 981-82 (S.D. Ind. 2003) (district court refused to allow the EEOC to expand its lawsuit to include a nationwide class following discovery on its original complaint and rejected the EEOC's argument that defendant knew or should have known it was subject to a nationwide class action as a result of the discovery requests); *EEOC v. Outback Steak House, Inc.*, 520 F. Supp. 2d 1250, 1263-66 (D. Colo. 2007) (local focus of EEOC's pre-suit investigations failed to put defendant on notice about the national scope of the agency's forthcoming litigation despite inquiries about the company's national employment policies). Courts have also frowned upon the improper use of the conciliation process to deter rather than

encourage settlement.  *See Agro Distrib.*, 555 F.3d at 468-69 (because the EEOC failed to

conciliate in good faith and satisfy its pre-suit obligations, the district court could have dismissed

the case); *EEOC v. Bloomberg L.P.*, 751 F. Supp. 2d 628, 642 (S.D.N.Y. 2010) (token effort to

conciliate did not satisfy pre-suit obligation) (citing *Agro Distrib.*).

With respect to the relationship between the EEOC's pre-suit investigation and the civil

action arising therefrom, federal courts have recognized that there is a legally significant

difference "between facts gathered during the scope of an investigation and facts gathered during

the discovery phase of an already-filed lawsuit."  *Jillian's*, 279 F. Supp. 2d 974, 982 (S.D. Ind.

2003).  Thus, while the EEOC "may obtain relief for instances of discrimination that it discovers

during an investigation of a timely charge…. these investigations may not be accomplished

through a process of discovery that follows a complaint based upon an insufficient charge of

discrimination."  *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 972 (7th Cir. 1996).  In

other words, "the EEOC 'may not use discovery in the resulting lawsuit as a fishing expedition

to uncover more violations.'"  *Dillard's*, 2011 WL 2784516, at *7 (quoting *EEOC v. Target

Corp.*, No. 02-CV-146, 2007 WL 146128, at *3 (E.D. Wis. May 16, 2007) (unpublished));

*accord Walner*, 91 F.3d at 971.

Recently, the Eight Circuit ruled that the EEOC could not proceed with a suit on behalf

of a "class of employees and prospective employees [subjected] to sexual harassment" because

said class was never defined prior to the institution of the lawsuit.  *CRST II*, 679 F.3d at 676.

Although the EEOC eventually identified 67 members of the "class" after commencement of the

action, the district court had refused to allow the EEOC to premise its lawsuit on the claims of

these newly-discovered class members:

> There was a clear and present danger that this case would drag on
> for years as the EEOC conducted wide-ranging discovery and

> continued to identify allegedly aggrieved persons.   The EEOC's litigation strategy was untenable: CRST faced a continuously moving target of allegedly aggrieved persons, the risk of never-ending discovery and indefinite continuance of trial.

*EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95, 2009 WL 2524402, at *9 (N.D. Iowa Aug. 13, 2009) (unpublished).  The Eighth Circuit affirmed the district court's reasoning and held that the EEOC could not partake in the fruits of this post-suit discovery.  *See CRST II*, 679 F.3d at 676-77.  These cases establish that the EEOC must make genuine and diligent efforts to resolve possible violations prior to filing a formal legal complaint in federal court.

On the other hand, the EEOC has referenced two federal circuit decisions that suggest substantive scrutiny of the agency's Title VII compliance is beyond a federal court's purview.  In *Caterpillar*, the Seventh Circuit held that "[t]he existence of probable cause to sue is ... not judicially reviewable."  409 F.3d at 833.  Moreover, the Sixth Circuit's decision in *Serrano v. Cintas Corp.* limited the scope of an inquiry into whether the EEOC satisfied its pre-suit obligations to a determination of "whether the EEOC made a good-faith effort to conciliate the claims it now asserts, thereby providing the employer with ample notice of the prospect of suit." 699 F.3d 884, 904 (6th Cir. 2012).  In so holding, the Sixth Circuit reversed the district court's conclusions that: (1) the EEOC never investigated or sought to conciliate claims on a class-wide basis; and (2) class-wide conciliation was not an adequate substitute for conciliation on behalf of the thirteen claimants the EEOC ultimately named in its enforcement action.  *Id.* (citing *EEOC v. Cintas Corp.*, Nos. 04-40132, 06-12311, 2010 WL 3733978, at *6-9 (E.D. Mich. Sept. 20, 2010) (unpublished)).   The EEOC's communications to the employer that it was investigating discrimination of "females as a class" in the reasonable-cause determination letter and the mere representation that the agency sought class-based remedies for "other similarly situated qualified female applicants who sought employment with [the defendant]" was enough to satisfy the

17

agency's administrative prerequisites to sue on behalf of the subject class of female grievants. *Id.*

An examination of the record shows that the EEOC undertook minimal investigation before filing the instant lawsuit.  The agency failed to obtain information as to whether employees at any of U.S. Steel's other plants were subject to this policy.  Instead, as Mr. Southworth admits, the plan was for the EEOC to wait until "later" to find additional members of the class.  (Docket No. 248-1, at 7).  Furthermore, the EEOC did little actual investigation as to Ms. DeSimone's charge and whether U.S. Steel's policy could be justified by the business necessity exception.  Indeed, Ms. DeSimone testified that she could not remember being asked about U.S. Steel's alcohol test policy, the equipment used at the Clairton plant, or the protective equipment that employees were required to wear.  (Docket No. 230-29, at 3-5).  Despite Ms. DeSimone's availability to provide additional information about the day-to-day conditions inside the plant and leads as to other potential claimants, as well as the fact that the USW was literally a few blocks away, the EEOC opted to rest on the assumption that random alcohol tests constituted a *per se* violation of the ADA.  Indeed, no investigators even stepped foot into a U.S. Steel plant. (Docket No. 230-20, at 4).  While the EEOC received a list of probationary employees identified by number who had been randomly tested and was aware of the employees previously named by Ms. DeSimone, (Docket No. 248-1, at 5; Docket No. 248-2, at 3-10, 22-23, 26), the agency did not continue to seek the identities of other individuals in this global class on whose behalf the EEOC now seeks to litigate.  (Docket No. 248-1, at 7).  As the *East Hills Ford Sales* decision demonstrates, however, the EEOC fails to identify additional members of a purported class of claimants at its own peril.

The absence of the LOD or any other documentary evidence as to the substance of the conciliation process, however, precludes disposing of this case on the basis that the EEOC failed to satisfy its pre-suit obligations.  *See EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 366 n.14 (4th Cir. 1976) ("Since the determination of reasonable cause defines the framework for conciliation, it follows that the issues to be litigated here must be those which can fairly be said to be encompassed within the determination resulting from the [initiating] charge.") (quotations and citation omitted).   Prior cases on this matter have examined the content of the agency's "reasonable cause" determination, making the LOD document an integral part of the pre-suit process.  *See, e.g.*, *CRST II*, 679 F.3d at 676; *Serrano*, 699 F.3d at 904; *Am. Home Prods. Corp.*, 165 F. Supp. 2d at 914.  Furthermore, virtually every case holding that the EEOC failed to satisfy the Title VII prerequisites brought before this Court's attention has delved into the details of the conciliation process.  *See, e.g.*, *E. Hills Ford Sales*, 445 F. Supp. at 988-89; *Agro Distrib., LLC*, 555 F.3d at 468-69; *Bloomberg L.P.*, 751 F. Supp. 2d at 642.

The Court previously ruled that the LOD and other confidential conciliation documents cannot be disclosed absent the written consent of all involved parties.  (Docket No. 118).  To date, however, U.S. Steel has not consented to the release of these documents.  (Docket No. 263, at 5).  In this Court's estimation, if U.S. Steel seeks dismissal on the basis that it was not afforded notice of the potential class action, it must provide the appropriate documentary evidence from the conciliation process as the party bringing the summary judgment motion.  *Conoshenti*, 364 F.3d at 140.  The company cannot rely on unchallenged declarations by a supervisor recounting the investigation and conciliation process while withholding the crucial documents actually used by the EEOC to conduct investigation and conciliation.  As the movant

in a summary judgment proceeding, U.S. Steel should not be allowed to benefit from the ensuing evidentiary void.  In other words, the company "cannot have its cake and eat it, too."[8]

Even considering the record as it now stands, there is a genuine issue of material fact as to whether the EEOC satisfied its Title VII pre-suit procedures.  There was an investigation into Ms. DeSimone's claim.  Said investigation culminated in a PDL that concluded U.S. Steel had violated the ADA "with respect to the alcohol testing of probationary employees as a class." (Docket No. 248-2, at 32).  This much is confirmed by Mr. Seitz, who acknowledged the PDL concluded that the company "administer[ed] such tests to probationary employees on a class-wide basis without any reasonable belief that the individuals tested were under the influence of drugs or alcohol." (Docket No. 230-20, at 3-4).  An attempt at conciliation was also made.  *See* (Docket No. 103, at 3) (listing undisclosed documents relating to the failed conciliation).  Given that the Sixth Circuit in *Serrano* found that the mere statement "females as a class" in the reasonable cause determination letter was sufficient to put the employer on notice that it had investigated and sought to conciliate class-wide claims, 699 F.3d at 904, the PDL's similar language about the illegality of testing "probationary employees on a class-wide basis" indicates that U.S. Steel was likewise on notice about the scope and nature of any possible lawsuit arising from the EEOC's investigation.  For these reasons, the Court finds that U.S. Steel has failed to carry its summary judgment burden of showing the EEOC did not satisfy its Title VII pre-suit investigatory obligations.  Because summary judgment is denied on this basis, the Court declines

---

[8] According to U.S. Steel, Mrs. DeSimone also has not provided written consent to disclose these conciliation documents. (Docket No. 263, at 5).  It is not clear whether she has been asked to consent to disclosure of said documents or whether she will be allowed to consent given that she has already reached a settlement with U.S. Steel.  Nevertheless, the Court stresses that it remains U.S. Steel's burden as the movant on summary judgment to enter sufficient evidence to show there is no genuine issue of material fact.  *See* FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact...").

to address the apparent conflict between *Serrano*, *CRST II*, and *Caterpillar*.   Accordingly, the Court will now address the legality of U.S. Steel's alcohol testing policy on the merits.

### B.   Medical Exams and Inquiries Pursuant to 42 U.S.C. § 12112(d)(4)(A)

The EEOC alleges that U.S. Steel's policy of randomly breath testing probationary employees constitutes a medical examination.   (Docket No. 3, at ¶¶ 31-14).   The ADA limits the discretion of employers to subject their employees to medical examinations or inquiries, unless the challenged practice is covered by the business necessity exception:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).[9]   In addition to the "job-related and consistent with business necessity" exception built into the ADA's broad ban on medical testing, employers are also permitted to conduct medical examinations as "part of an employee health program available to employees at that work site."   42 U.S.C. § 12112(d)(4)(B).   U.S. Steel asserts that its breath alcohol testing program is covered by both exceptions.   (Docket No. 228, at 11, 21-27). Furthermore, it claims that other federal laws necessitate use of this testing policy and, as such, claims a defense on this ground pursuant to 29 C.F.R. § 1630.15(e).   For the following reasons, the Court agrees that the policy is job-related and consistent with business necessity and rules on that basis.   To the extent that the EEOC relies on its Enforcement Guidance publication as legal support, the Court finds this argument unpersuasive.   Having found for U.S. Steel on the

---

[9] Similarly, a related provision in this subchapter prohibits employers from "using qualifications standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities."   42 U.S.C. § 12112(b)(6).   Again, the statute carves out an exception for such tests that, "as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity."   *Id.*

business necessity exception, the Court shall only briefly discuss the employee health program exception and whether the policy is necessitated by federal law.

### 1. U.S. Steel's Policy is Job-Related and Consistent with Business Necessity

The employer bears the burden of showing that a medical examination is "job-related and consistent with business necessity." *Pennsylvania State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 252 (M.D. Pa. 2008) (citing *Ward v. Merck & Co.*, 226 F. App'x 131, 141 (3d Cir. 2007) (unpublished)). "The ADA's requirement that a [medical examination] be consistent with business necessity is an objective one." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d. Cir. 2001) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119 n.6 (11th Cir. 1993)). As the Third Circuit elaborated, "a 'good faith' mandatory medical examination by an employer may nevertheless give rise to liability if the court determines that the examination was unwarranted." *Tice*, 247 F.3d at 518. An employee does not need to be disabled within the meaning of the ADA to challenge a medical examination or inquiry. *See Green v. Joy Cone Co.*, 278 F. Supp. 2d 526, 538 (W.D. Pa. 2003).

In determining whether an employer has shown that a medical examination or inquiry is job-related and consistent with business necessity, courts have first required employers to establish that: (1) a business necessity exists, and (2) the policy at issue serves the asserted business necessity. *See Pennsylvania State Troopers*, 621 F. Supp. 2d at 254-55 (applying a two-step analytical framework); *accord Conroy v. New York State Dep't of Correctional Servs.*, 333 F.3d 88, 97-98 (2d Cir. 2003) (same). A business necessity that could warrant a medical examination must be "'vital to a business,'" such as "'ensuring that the workplace is safe and secure or cutting down on egregious absenteeism.'" *Ward*, 226 F. App'x at 140 (quoting *Conroy*, 333 F.3d at 98); *see also Tice*, 247 F.3d at 517 (plaintiff's complaints of pain, spasms,

difficulty in walking, and use of "narcotic" medication "raised legitimate safety concerns about [the plaintiff's] ability to drive a bus"); *Varley v. Highlands Sch. Dist.*, No. 06-631, 2007 WL 3020449, at *9 (W.D. Pa. Oct. 11, 2007) (unpublished) ("If a perceived safety concern was shown in the workplace, it would suffice to establish the 'business necessity' element of the ADA's standard for requiring a medical exam.") (citing *Ward*; *Conroy*).  Courts in other circuits have similarly found safety to be a business necessity.  *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) ("[w]e have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees") (citations omitted); *Transport Workers Union of Am., Local 100, AFL-CIO v. N.Y. City Transit Auth.*, 341 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2004) ("The record clearly shows that it is a business necessity for the Authority to ensure that bus operators are fit to perform their duties. The danger that may be posed by an unfit bus operator is obvious and undisputed.").

U.S. Steel argues that the alcohol testing policy is "job-related and consistent with business necessity" because it enables the company to detect alcohol impairment on the job, thereby serving the business necessity of eliminating hazards in the workplace.  (Docket No. 228, at 14-15).  There is no question that maintaining workplace safety is a legitimate and vital business necessity.  *See Tice*, 247 F.3d at 517; *Ward*, 226 F. App'x at 140.  Rather, the focus of this dispute is whether a policy of conducting random breath alcohol testing on probationary employees in a coke manufacturing facility sufficiently serves the asserted safety rationale.

In order to show that the policy at issue serves the asserted business necessity, employers must demonstrate that the examination or inquiry at issue "genuinely serves the asserted business necessity and ... is no broader or more intrusive than necessary."  *Conroy*, 333 F.3d at 98; *accord Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (quoting *Conroy*); *Pennsylvania State*

*Troopers*, 621 F. Supp. 2d at 253 (quoting *Conroy*).   The EEOC's steadfast position is that §

12112(d)(4)(A) does not permit medical testing unless and until the employer has an

individualized, reasonable suspicion of a safety concern.   (Docket No. 248, at 14, 16).   The

agency reasons that because a <u>random</u> alcohol breath testing policy cannot supply the requisite

individualized, reasonable suspicion of intoxication, such testing must be *per se* invalid.   *Id.*   In

fact, the notion that random testing presumptively violates the ADA was used by Mr. Southworth

in his PDL, wherein he represented that the ADA permitted alcohol tests "if [employers] have a

reasonable belief that an employee may be under the influence of alcohol at work."   (Docket No.

248-2, at 32).   Based on his finding that the "Charging Party was randomly chosen for the

testing," he determined that U.S. Steel lacked the requisite reasonable belief of intoxication to

administer the breath alcohol examination.   *Id.*

Neither party has brought to the Court's attention any prior cases involving random drug

or alcohol tests on a subset of employees in the context of § 12112(d)(4)(A) claim.   Moreover,

nothing in the text of § 12112(d)(4)(A) itself specifically requires employers to possess

suspicion, reasonable or otherwise, that an employee presents a safety hazard before conducting

a random breath alcohol test on neophyte employees.   Independent research indicates that this is

a novel question of law in this circuit and elsewhere, as almost all cases involving §

12112(d)(4)(A) address claims of specific individuals who were forced to undergo medical

testing instead of a broad mandate that was generally applicable as to a subset of employees.

A few general principles can be distilled from prior decisional law concerning whether a

disputed policy serves a business necessity pursuant to § 12112(d)(4)(A).   There is ample

support for the proposition that an employer must generally possess some minimal job-related

justification before insisting on a medical examination.   As the Third Circuit suggests, an

24

employer may only subject an employee to a medical examination when it "ha[s] good reason to be doubtful of [the employee's] abilities." *Tice*, 247 F.3d at 519; *see also Ward*, 226 F. App'x at 139 & n.20 (permitting a fitness-for-duty evaluation in response to complaints about the plaintiff's work performance and his strange behavior among his fellow employees, stating that an employer should "'identify a legitimate, non-discriminatory reason[ ] to doubt the employee's capacity to perform his or her duties'") (quoting *Conroy*, 333 F.3d at 98).   Courts elsewhere in this circuit ruling on the business necessity exception have thus terminated the case favorably for the employer when the need to conduct a medical test on the employee was readily apparent.   *See Scott v. Allied Waste Servs. of Bucks-Mont*, No. 10-105, 2010 WL 5257643, at *5 (E.D. Pa. Dec. 23, 2010) (unpublished) (summary judgment for defendant where plaintiff was ordered to undergo a psychological examination on the basis of workplace safety concerns after issuing statements about committing suicide at work); *Law v. Garden State Tanning*, 159 F. Supp. 2d 787, 794 (E.D. Pa. 2001) (employer enforcing its mandatory alcohol and drug policy could require plaintiff to take a psychiatric exam as part of a drug rehabilitation program after it was revealed that he previously tested positive for marijuana).   Other federal circuits have more explicitly articulated the need for employers to be cognizant of a specific need to test a particular employee.   *See, e.g.*, *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) ("for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job"); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (finding that defendant had "legitimate reasons" to doubt plaintiff's ability to perform work duties and to order a medical examination); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) ("we hold that the business necessity standard may be met even before an employee's work performance

declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job") (quoting *Sullivan*).

Decisions on the interpretation of § 12112(b)(6), an analogous statute concerning the screening of qualified individuals with a disability containing a business necessity exception, also support the conclusion that across-the-board medical screenings are not *per se* violations of the ADA.  *See also EEOC v. Murray, Inc.*, 175 F. Supp. 2d 1053, 1062 (M.D. Tenn. 2001) (noting that the "job-related and consistent with business necessity" provisions in § 12112(d)(4)(A) and § 12112(b)(6) applied equally in considering whether an across-the-board medical screening on forklift drivers violated the ADA).  Courts interpreting § 12112(b)(6) have repeatedly emphasized that the business necessity exception addresses whether the subject medical qualification standard "can be justified as an across-the-board requirement" rather than focusing on "examining the specific risk posed by the employee's disability" like in direct threat analysis.  *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000); *see also Verzeni v. Potter*, 109 F. App'x 485, 491 (3d Cir. 2004) (unpublished) (distinguishing direct threat analysis from the business necessity defense).

With respect to the practice of subjecting only some employees to medical testing or inquiries, however, the Third Circuit has explained that disparate application of a medical testing policy among similarly-situated employees may undercut the employer's asserted business necessity defense:

> [A]n employer's standard practice with regard to medical examinations is certainly relevant evidence of what is "necessary" ..., and, just as we routinely hold that evidence of differential treatment among similarly situated employees is probative on the issue of discrimination in Title VII suits, an employer's differential application of a medical examination requirement is relevant evidence of what is 'necessary' to the employer's business.

*Tice*, 247 F.3d at 518.   Whether employees are "similarly situated," however, is a fact determination and "any comparison between employees must be made with an eye to the ultimate inquiry, i.e., the necessity of the examination of the *plaintiff*."   *Id.* at 519 (emphasis in original).   It therefore follows that a medical examination or inquiry conducted on a subset of employees rather than all employees must be justified by an explanation for the necessity of the examination on the subset of employees.   Following *Tice*, at least one court in this circuit has so held that the differential application of an illness reporting policy did not comply with ADA standards based, in part, on the employer's inability to adequately explain why it applied different standards to employees who requested sick leave as opposed to those who did not.   *See Pennsylvania State Troopers*, 621 F. Supp. 2d at 259 ("First, [defendant] primarily justifies the policy because it allegedly enables ... supervisors to detect latent injuries that could impair members' job performance.   However, [defendant] does not inquire about such conditions among members who do not request sick leave, and [defendant] has not established a reasonable basis for his belief that all members who use sick leave pose such risks.").   Conversely, at least one federal district court in the Second Circuit has commented that an illness reporting policy should be applied to the smallest identifiable subset of at-risk employees, as determined by looking at the risks and fitness requirements involved on the job.   *See Fountain v. New York State Dep't of Corr. Servs.*, No. 99-CV-389, 2005 WL 1502146, at *10 (N.D.N.Y. June 23, 2005) (unpublished).   As the court in *Fountain* explained, failure to limit the subject policy to an appropriately narrow class of employees makes it more difficult to prove business necessity and creates the inference that it is more broad or intrusive than necessary.   *Id.* (citing *Conroy*, 333 F.3d at 102).

Somewhat incongruently with the narrow tailoring requirement, courts have simultaneously held that the employer "'need not show that the examination or inquiry is the only way of achieving a business necessity.'" *Pennsylvania State Troopers*, 621 F.Supp.2d at 253 (quoting *Conroy*, 333 F.3d at 98). Rather, the examination or inquiry "'must be a reasonably effective method of achieving the employer's goal.'" *Id.* (quoting *Conroy*, 333 F.3d at 98); *accord Thomas*, 483 F.3d at 527 (same). Where employers advancing safety as the business necessity demonstrate that the medical test or inquiry "makes even a small contribution to reducing the risks posed by unfit [employees], it is amply justified." *Transp. Workers Union*, 341 F. Supp. 2d at 450-51. Employers also need not be aware of imminent danger before requiring an employee to undergo medical testing. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("Contrary to [plaintiff's] contention, the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries."); *Coffman*, 578 F.3d at 565-66 (permitting a psychiatric evaluation for a firefighter "to ensure that the workforce is both mentally and physically capable of performing what is doubtlessly mentally and physically demanding work"); *Kirkish v. Mesa Imports, Inc.*, No. 08-1965, 2010 WL 364183, at *6 (D. Ariz. Feb 1, 2010) (unpublished) (fact that plaintiff was taking prescription pain medications was sufficient to establish the necessity of a medical inquiry for an employee whose job required driving).

Given the dearth of case law on point, the Court recognizes that the "job-related and consistent with business necessity" exception remains a nebulous concept. In the context of § 12112(b)(6), the Supreme Court has characterized the "job-related and consistent with business necessity" language as having "spacious defensive categories." *Chevron U.S.A. Inc. v.*

*Echazabal*, 536 U.S. 73, 80 (2002).  Even more, the case law is so unsettled on the specific application of § 12112(d)(4)(A) that the parties have cited to two seemingly conflicting, non-binding cases involving across-the-board mandatory testing on a subset of employees.   In *Pennsylvania State Troopers*, the court held that a medical reporting measure for employees who take sick leave was not permissible, in part, because the police commissioner "has not established a reasonable basis for his belief that all members who use sick leave pose such risks." 621 F. Supp. 2d at 259.  By contrast, the court in *Wice v. Gen. Motors Corp.* permitted the defendant to periodically screen drivers of heavy mobile equipment for medical conditions that can affect their ability to operate in-plant machinery safely.  No. 07-10662, 2008 WL 5235996, at *3-4 (E.D. Mich. Dec. 15, 2008) (unpublished).  As the court in *Wice* explained, "[c]ommon sense suggests [defendant] does not have to wait for an accident to occur to justify screening employees."  *Id.* at *3.   Accordingly, the Court is hesitant to depart from the common understanding of the phrase and create bright line rules where there is no mandatory authority to do so.

After considering the relevant legal authority and legislative history behind the ADA's prohibition on medical examinations or inquiries as well as the nature of the testing policy in the context of a busy steel factory, the Court finds that U.S. Steel's policy of randomly testing probationary employees at the Clairton Coke Plant and similar facilities is job-related and consistent with business necessity within the meaning of § 12112(d)(4)(A).

### a) Random Alcohol Testing is Both Necessary for Maintaining Employee Safety and Effective at Preventing Alcohol-Related Accidents

The uncontested facts in the record reveal that probationary employees are charged with performing dangerous and safety-sensitive duties alongside regular employees.   In order to

survive a hazardous work environment that includes molten hot coke, toxic waste products, and massive moving machinery, (Docket No. 230-1, at 4-8, 11-12), employees must be alert at all times.  No level of intoxication is acceptable on the job in these circumstances.[10]

The possibility that employees would arrive at work intoxicated is not mere conjecture—it became a real problem at U.S. Steel's Gary Works plant in Indiana.  (Docket No. 261, at 10).  In order to combat this safety issue, U.S. Steel instituted a program of random alcohol and drug testing in 1997.  *Id.*; (Docket No. 229, at ¶ 67; Docket No. 230-11, at 4).  Based on the model program implemented at the Gary plant, both U.S. Steel and the USW agreed to specifically authorize random alcohol testing on probationary employees in the BLA for workers at the Clairton plant.  (Docket No. 230-11, at 4).  The fact that the BLA constitutes a negotiated agreement between U.S. Steel and the USW is not lost on the Court, as it further highlights the consensus by all parties involved that such testing was consistent with maintaining workplace safety.

Many employers already use random drug and alcohol testing for employees working in safety-sensitive or mission critical positions.  In particular, the Court takes judicial notice of the fact that the University of Georgia subjects probationary employees in safety-sensitive positions to alcohol tests and provides that a positive result automatically results in immediate termination.  *Controlled Substance and Alcohol Testing Policy*, UNIVERSITY OF GEORGIA, http://www.hr.uga.edu/controlled-substance.  Employees at Florida State University working in "sensitive positions" on projects for the Department of Defense are also randomly tested for drugs and alcohol.  *OP-C-7-G Employee & Labor Relations*, FLORIDA STATE UNIVERSITY, http://policies.vpfa.fsu.edu/personnel/3g.html.  Moreover, several federal agencies mandate such

---

[10] The Court notes that even  Mrs. DeSimone, the charging party, testified that she did not want anyone under the influence of alcohol working with her family members at the Clairton Coke Plant because "[i]t's a safety issue." (Docket No. 230-29, at 6).

testing in safety-sensitive work environments.   The Nuclear Regulatory Agency requires that nuclear plant operators "shall implement drug and alcohol testing programs."   10 C.F.R. § 26.31(a).   Random testing is listed among the types of testing that nuclear plant operators must conduct.   *Id.* at § 26.31(c)(5).   Similar regulations have been promulgated by the Federal Motor Carrier Safety Administration, *see* 49 C.F.R. § 382.305 (a) (drivers of motor carriers must submit to random alcohol and controlled substance testing), the Federal Railroad Administration, *see* 49 C.F.R. § 219.601(a) ("[e]ach railroad must submit for FRA approval a random testing program"), and the Federal Aviation Administration.   *See* 14 C.F.R. § 120.217(c) (employees performing safety-sensitive functions must be given alcohol testing on a random basis).   The common theme in these existing practices is that random testing can and should be used on employees who work in positions where even the smallest miscalculation can lead to dire consequences.

While the inclusion of a quantitative comparison showing the effectiveness of U.S. Steel's policy on curbing substance abuse in the workplace would be helpful,[11] the absence of such studies is not fatal.   It is inconceivable that U.S. Steel or any other employer would expend resources to use such tests if they were not effective in improving employee performance and safety.   Nor would it make sense for federal regulators to mandate random testing of employees in safety-sensitive positions if it did not serve to reduce the likelihood of drug and alcohol abuse in the workplace.   Indeed, one of the benefits of having a random testing policy in place is its deterrence effect.   The Department of Labor's website confirms that "[b]ecause this type of testing has no advance notice, it serves as a deterrent."   Workplace Drug Testing, UNITED STATES DEPARTMENT OF LABOR, http://www.dol.gov/elaws/asp/drugfree/drugs/dt.asp#q4.   This

---

[11] For example, by review of workers' compensation or disability claims, U.S. Steel could potentially secure information on how often alcohol-related accidents occurred in the time period before and after implementation of the subject testing policy.   However, the EEOC's uncompromising stance that the ADA generally prohibits medical inquiries would doubtlessly complicate any investigation into how often workers actually arrive at work in an intoxicated state.

deterrence effect weighs heavily in the determination that the subject policy served the asserted business necessity of workplace safety.[12]

### b) Limitation of the Random Alcohol Testing Program to Probationary Employees is Justified

The Court also finds no issue with limiting the scope of the random testing program only to probationary employees.  It would be entirely consistent with precedent to permit random testing on a group of similarly situated employees who pose an elevated risk to workplace safety. Neither *Pennsylvania State Troopers* nor *Fountain* specifically prohibited medical exams or inquiries on a subset of employees.  Rather, those courts sought more persuasive justification from employers before separating a subset of employees for differential treatment.  Such a justification was found in *Wice*, which specifically permitted testing on drivers of heavy mobile equipment on the basis that these particular employees posed an elevated risk to their fellow employees.  2008 WL 5235996, at *3-4.

Regular employees who remain on the job for a long period of time have proven that they can follow the appropriate safety standards and adequately perform their job on a daily basis. Not so with new employees.  Common sense dictates that new hires would be comparatively less skilled at performing their jobs, are relatively unfamiliar with company rules, and would not have fully internalized the importance of workplace safety.  These untrained factory workers are inherently more dangerous to themselves as well as others because of their lack of training and familiarity with their job.  Moreover, their lack of experience on the job directly ties into the elevated chance that they will arrive at work in an unfit state.  Until new hires have been on the job long enough to appreciate the risks in the workplace, they will be more likely to engage in

---

[12] Out of 150 probation employees tested since January 1, 2007, only four were fired for testing positive for drugs or alcohol including Mrs. DeSimone.  (Docket No. 248-2, at 26-27).  Although Mrs. DeSimone and one other employee who was not terminated had false positives during this time period, the general incidence of testing positive is low.

risky behavior than regular employees.   Accordingly, the BLA reserves to U.S. Steel near-plenary power to terminate probationary employees who cannot make the grade.  (Docket No. 230-14, at 2).  There is no room for error when the dangers are as numerous and serious as in a coke plant.  Any lapse in concentration can be catastrophic.  Even a 1,040-hour experience differential becomes critical when the stakes are so high.  Simply put, probationary employees are not "similarly situated" with regular employees.  *Tice*, 247 F.3d at 519.

The need for random testing is obvious in light of the difficulty of singling out employees who are under the influence of alcohol while on the job.  As shown by the fact that many employers already conduct random drug and alcohol testing, it is impossible to control substance abuse in the workplace simply by pulling suspected individuals aside for testing.  That numerous federal agencies mandate random testing on top of periodic and for-cause testing further underscores this tool's importance.  *See* 10 C.F.R. § 26.31(c) (requiring random testing in addition to pre-access, for cause, and post-event testing); 49 C.F.R. §§ 382.301, et. seq. (requiring pre-employment, post-accident, random, reasonable suspicion, return-to-duty, and follow-up testing); 14 C.F.R. § 120.217 (pre-employment, post-accident, random, reasonable suspicion, return-to-duty, and follow-up testing).   This difficulty is even more acute for supervisors who have not yet developed a reference point for new hires on which to judge whether a particular probationary employee is intoxicated or sober.   While becoming more familiar with one's fellow co-workers naturally takes time, this process is complicated by the sheer number of probationary employees each manager must supervise and the fact that new hires are not simply assigned to a manager.  As Area Manager Daniel P. Cumer has testified, there is one manager for two sets of batteries as well as approximately seven to nine new hires on a battery per shift.  (Docket No. 230-1, at 15).  These probationary employees switch batteries on

a regular basis and may have three to four different managers per week, *id.* at 16, thus further reducing the likelihood that a manager will become familiar with any given probationary employee's work habits.

Furthermore, extraordinary conditions are present within a coke and chemical plant that make the singular reliance on for-cause testing completely inadequate.  Because of the hazardous nature of factory operations, all employees must wear heavy protective gear that obscure their faces and muffle their speech.  *Id.* at 13, 15-16.  Although the approximately 400 probationary employees at the Clairton Coke Plant wear distinctive helmets, *id.* at 15; (Docket No. 261, at 12), they are interspersed among well over a thousand other employees.  (Docket No. 230-11, at 2).  Plant managers must also wear the protective gear, making it even more difficult to ascertain whether a particular at-risk employee is exhibiting signs of intoxication in the bustling factory setting.  (Docket No. 230-1, at 15-16).

### c)  U.S. Steel's Alcohol Testing Policy Is in Accord with the Purposes of the ADA

The goal of the ADA's ban on medical inquiries was to prevent employers from disfavoring people with disabilities based on "stereotypes, discomfort, misconceptions, and unfounded fears about increased costs and decreased productivity" and otherwise "stigmatiz[ing] the person with a disability."  H.R. REP. NO. 101-485, pt. II, at 71, 75 (1990); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (quoting Senator Tom Harkin's statement that "[t]he thesis of the [ADA] is simply this: That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged based on the relevant medical evidence and the abilities they have").  However, the EEOC does not complain that U.S. Steel's testing policy was somehow designed to disqualify or shame employees with medical

conditions working at their facilities.  As the evidence shows, the breath alcohol testing program was conceived as a way to detect and deter alcohol use in the workplace.  Nor does the EEOC take issue with the particular method of alcohol testing involved.  U.S. Steel has pointed out cases in which more intrusive testing measures withstood ADA challenges.  (Docket No. 228, at 17); *see Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665 (7th Cir. 2011) (use of blood alcohol test approved); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180 (6th Cir. 1997) (urine alcohol test approved).  Rather, the EEOC objects to the fact that U.S. Steel randomly tested a specific subset of employees instead of limiting the testing to employees who were suspected of being intoxicated.  (Docket No. 3, at ¶ 15b; Docket No. 248, at 14).

On the other hand, U.S. Steel has argued that any attempt to target suspected employees would expose the company to the significant possibility of harassment lawsuits precisely because supervisors do not have the opportunity to detect signs of impairment at the workplace.  (Docket No. 261, at 11).  Requiring employers to have objective evidence of impairment may make sense in an office setting, where supervisors can clearly see if their employees are exhibiting abnormal behavior or smell of alcohol.  This requirement makes no sense in the context of an industrial production facility like the Clairton Coke Plant, where employees are covered from head to toe in protective clothing and equipment.

To the extent that the EEOC argues that the subject policy should be invalidated because it was not applied to regular employees, (Docket No. 248, at 19-20; Docket No. 258, at 4-5), such a position would be inconsistent with the ADA's goal of limiting medical testing and inquiries.  In order to maintain deterrent value, any expansion in the breadth of a testing program must be accompanied by an increase in the frequency of testing.  By expanding the scope and frequency of medical testing, however, the EEOC would increase the possibility that an

35

employee's stigmatizing medical conditions will be revealed.   Such a move contravenes the requirement articulated in *Conroy*, *Fountain*, and *Pennsylvania State Troopers* that the testing be narrowly tailored rather than broad and intrusive.

Additionally, the EEOC has conceded that § 12112(d)(4)(A)'s business necessity exception encompasses periodic across-the-board drug and alcohol testing of police officers, firefighters, private security officers, and other positions affecting "public safety."  (Docket No. 258, at 4).  The legislative history on the ADA's ban on medical exams also acknowledges the wisdom of existing federal regulations requiring testing of bus and truck drivers, airplane pilots, flight attendants, as well as other positions implicating public safety.  H.R. REP. NO. 101-485, pt. II, at 74.  The Court does not see why the rationale behind including such preemptive measures within the scope of the business necessity should be so limited.   Contrary to the EEOC's assertion, police officers and firefighters are not engaged in "paramilitary" activity, and there has been no legal support proffered to support such a premise.   Even if police officers and firefighters can be distinguished as being public servants whose jobs are to protect the public, the agency ignores that private security officers, bus drivers, flight attendants, and nuclear plant operators have no such overriding duty to protect the public.   These are jobs that, if performed badly, could result in harm to others in the general public.   Yet, there is no reason to deem the lives of those in the general public less worthy of protecting than the lives of one's co-workers. Where the guiding principle of the business necessity exception is to permit employers to take preemptive steps to protect people from injury, the Court sees no reason to make a distinction in the kinds of people that such employers are allowed to protect.   The life of a person is no less valuable simply because he or she decided to work in a factory rather than take a walk through the park.

### d) Conclusion

To recapitulate, the Court holds that random breath alcohol testing can be used on probationary employees in safety-sensitive positions at facilities like the Clairton Coke Plant because safety is a business necessity and the testing policy genuinely serves this safety rationale and is no broader or more intrusive than necessary.  *See Conroy*, 333 F.3d at 97-98; *Pennsylvania State Troopers*, 621 F. Supp. 2d at 254-55.  The unique deterrence effect of such random testing has not been questioned by either the EEOC or other federal agencies that mandate this procedure on employees in safety-sensitive positions.  Given the inability of supervisors to detect signs of impairment on employees who are heavily clad in protective gear, the focus on randomly testing only probationary employees is warranted both because such employees are less likely to comply with the alcohol policy and because application of the policy on veteran employees would be broader and more intrusive than necessary.  The EEOC's vision of the ADA would defy common sense by prohibiting random alcohol testing on new employees under the counterintuitive and unsupported premise that they are not more likely to engage in risky behavior like abusing alcohol at work.  Such an outcome could result in a work environment that is less safe and would do nothing to further the purposes of the ADA in eliminating employment practices that unfairly punish people with disabilities or threaten to stigmatize them by revealing an embarrassing medical condition.[13]  Therefore, the Court is compelled to grant summary judgment in U.S. Steel's favor on the basis that the policy and practice of randomly conducting alcohol tests on probationary employees working in facilities like the Clairton Coke Plant is job-related and consistent with business necessity.

---

[13] Although the policy of alcohol testing can be permitted as a business necessity pursuant to 42 U.S.C. § 12112(d)(4)(A), U.S. Steel is still under an obligation to comply with the remainder of the ADA.  Thus, it would be improper to use the test results to discriminate against an employee with a qualified disability or by failing to make a reasonable accommodation.  42 U.S.C. §§ 12112(a), (b)(5).

### 2.   The EEOC's Enforcement Guidance is Not Persuasive

The EEOC's attempt to rely on its Enforcement Guidance publication as legal support for its position is unavailing and does not alter the Court's determination that the policy falls under § 12112(d)(4)(A)'s business necessity exception.   To support the proposition that a random drug and alcohol screening system violates the ADA, the EEOC cites to the agency's own guidelines regarding how it enforces the ADA:

> Generally, a disability-related inquiry or medical examination of an employee may be "job-related and consistent with business necessity" when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." Disability-related inquiries and medical examinations that follow up on a request for reasonable accommodation when the disability or need for accommodation is not known or obvious also may be job-related and consistent with business necessity.
>
> Sometimes this standard may be met when an employer knows about a particular employee's medical condition, has observed performance problems, and reasonably can attribute the problems to the medical condition.   An employer also may be given reliable information by a credible third party that an employee has a medical condition, or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat.   In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

EEOC, ENFORCEMENT GUIDANCE: DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT, No. 915.002, 2000 WL 33407181, at *6 (July 27, 2000).   The Enforcement Guidance also provides that "periodic medical examinations of employees in positions affecting public safety that are narrowly tailored to address specific job-related concerns" is permissible. *Id.* at *16.   The EEOC specifically includes among the kinds of positions affecting public safety fire fighters, police

officers, and private security officers.  *Id.*  Furthermore, the EEOC indicates that it would be permissible to subject an employee who has been off from work for alcohol rehabilitation to periodic alcohol testing upon his or her return "only if the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat in the absence of periodic testing." *Id.* at 15.  As the Enforcement Guidance explains, "[s]uch a reasonable belief requires an individualized assessment of the employee and his/her position and cannot be based on general assumptions." *Id.*

A court will generally accord deference to a federal agency's interpretation of a statute that it is responsible for administering where "the statute is silent or ambiguous with respect to the specific issue" and "the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  The agency's interpretation of law controls so long as "it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor the interpretation deemed *most* reasonable by the courts."  *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (citing *Chevron*, 467 U.S. at 843-44) (emphasis in original).

In order to qualify for *Chevron* deference, however, the agency's interpretation of law must have been "promulgated in the exercise of congressionally-delegated authority to make rules carrying the force of law."  *De Leon-Ochoa v. Attorney Gen. of the United States*, 622 F.3d 341, 348 (3d Cir. 2010) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  An agency interpretation that does not qualify for *Chevron* deference is entitled to respect only on the basis of its "power to persuade."  *Mead Corp.*, 533 U.S. at 235 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also De Leon-Ochoa*, 622 F.3d at 348-49 ("Agency action that does not qualify for *Chevron* deference may still deserve a lesser amount of deference under

*Skidmore v. Swift & Co.*, under which respect is granted to agency action according to its power to persuade.").

The Supreme Court explicitly withheld *Chevron* deference from an agency's "policy statements, agency manuals, and *enforcement guidelines*" because such materials "lack the force of law." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (emphasis added) (citations omitted).   In light of the Supreme Court's opinion in *Christensen* and the absence of any argument from the EEOC that it exercised its congressionally delegated rulemaking authority, there can be no dispute that the EEOC's "Enforcement Guidance" is only accorded *Skidmore* deference.   Indeed, the EEOC has even cited to *Sullivan* for the proposition that its administrative interpretation is "not controlling authority." (Docket No. 248, at 23) (citing *Sullivan*, 197 F.3d at 811-12).   Therefore, the subject enforcement guideline will be adopted only insofar as it is a persuasive interpretation of § 12112(d)(4)(A).

The EEOC maintains that its interpretation of § 12112(d)(4)(A) is persuasive.   The EEOC observes that some courts have adopted the objective evidence standard set forth in the guidance material, thereby proving that this standard is consistent with the goals of the ADA.   (Docket No. 248, at 23) (citing *Coffman*, 578 F.3d at 565-66; *Sullivan*, 197 F.3d at 811-12).   They further argue that Congress meant to "combat  the type of generalized assumptions Defendant makes here, and that is why the statute requires individualized assessments, such as in determining an appropriate reasonable accommodation or in conducting a direct threat analysis." *Id.*

The fact that other courts outside the Third Circuit have looked favorably upon the EEOC's Enforcement Guidance does not control the Court's consideration of what essentially remains an agency publication lacking the force of law.   More importantly, none of these non-binding cases dealt with random alcohol testing on a subset of employees.   The EEOC's reliance

on *Coffman* and *Sullivan* is therefore misplaced.  These rulings merely illustrate that the EEOC's proposed standard should apply when employers have the opportunity to doubt the ability of their employees to perform their duties.  As such, whatever persuasive value those courts saw in the Enforcement Guideline does not carry over to this case.

Turning to the text of § 12112(d)(4)(A), the EEOC has given no reason to believe that its assertion an employer must possess objective evidence of an employee's inability to perform prior to invoking the "job-related and consistent with business necessity" defense is tethered to the statutory language.  Nor does the legislative history rule out the practice of conducting preemptive testing for safety reasons.  *See* H.R. REP. NO. 101-485, pt. II, at 74 (contemplating medical tests to determine fitness for duty as well as whether workers can perform a job function that may have a significant impact on public safety).  To the extent that the Enforcement Guidance purports to impose a bright-line rule requiring objective evidence of intoxication without exception, such a standard defies common sense in circumstances when employers cannot detect evidence of impairment through layers of protective gear.  *Cf.* Jarod S. Gonzalez, *A Matter of Life and Death—Why the ADA Permits Mandatory Periodic Medical Examinations of "Remote-Location" Employees*, 66 LA. L. REV. 681, 698 (2006) (describing the EEOC's position set forth in the Enforcement Guidance as an inflexible "*per se* rule to prevent employers from even attempting to prove that their mandatory periodic medical examination policy meets the business necessity standard" and arguing that the "EEOC's position does not comport with the plain language of the statute and should not be followed by the courts").  This demanding position is even more impractical given that plant supervisors would have had little or no opportunity to familiarize themselves with the work habits of new hires to determine whether they are acting abnormally.

For these and other reasons stated in the preceding analysis, the Enforcement Guidance's insistence on objective evidence of intoxication even when employers cannot obtain such evidence is unpersuasive.

### 3.   U.S. Steel's Random Alcohol Breath Testing Program is Not a Voluntary Medical Examination or Part of an Employee Health Program

Although the ruling that U.S. Steel's alcohol testing policy falls within the business necessity exception is dispositive, the Court will also briefly address U.S. Steel's alternative argument that its policy is also part of a permissible employee health program.   The ADA expressly permits employers to "conduct voluntary medical examinations, ... which are part of an employee health program available to employees at that work site."   42 U.S.C. § 12112(d)(4)(B); *see also* 29 C.F.R. § 1630.14(d) ("A covered entity may conduct voluntary medical examinations and activities, including voluntary medical histories, which are part of an employee health program available to employees at the work site.").   As described in the EEOC's Enforcement Guidance, a wellness program within the meaning of this statute "is 'voluntary' as long as an employer neither requires participation nor penalizes employers who do not participate." EEOC, ENFORCEMENT GUIDANCE, 2000 WL 33407181, at *16.   An employer does not need to show that medical examinations conducted in the course of such a health program are job-related and consistent with job necessity.   *Id.*   Information obtained through such an employee health program must be kept confidential.   § 12112(d)(4)(C).

U.S. Steel appears to argue that these random drug and alcohol tests are part of a voluntary wellness program because the employees bargained for this provision through the USW.   (Docket No. 228, at 22).   These negotiations resulted in a BLA that set forth the parameters of the testing program, and every new employee had to sign the BLA as a condition of employment.   *Id.* at 23.   U.S. Steel further claims that the drug and alcohol tests are part of a

comprehensive wellness program because the section of the BLA detailing the testing program generally covered other employee health initiatives and included other provisions such as the "Right to a Safe and Healthful Workplace," "Right to Refuse Unsafe Work," "Right to Adequate Protective Equipment," "Right to Safety and Health Training," and "Right to a Proper Medical Program for Workplace Injuries and Illnesses." *Id.*

U.S. Steel's policy of testing its probationary employees for drugs and alcohol does not constitute a voluntary employee health program within the meaning of § 12112(d)(4)(B). The most natural reading of this provision suggests that employers are shielded from ADA liability when an employee consents to a medical examination or inquiry as part of an employer-sponsored initiative designed to improve his or her health and wellness. *See Huffman v. Smithkline Beecham Clinical Labs., Inc.*, 111 F. Supp. 2d 921, 926-27 (N.D. Ohio 2000) (describing a wellness program wherein the employer "provided mini-physicals to its employees and their spouses to evaluate their health and recommend healthy lifestyle changes" and "did not require its employees to participate"). No such voluntary health improvement initiative was involved here. Rather than providing tips on healthy living, an employee who cannot supply an adequate explanation for a positive test result is subject to termination. (Docket No. 230-28, at 2-3). Participation in this program by probationary employees is mandatory, as refusal to take the test is also grounds for dismissal. *Id.* at 2.

There is simply no evidence that the alcohol testing policy was anything more than a measure to screen out intoxicated employees from the workforce. In fact, the only part of U.S. Steel's policy manual detailing the alcohol testing program that mentions rehabilitation is in the context of workers who voluntarily seek help for their addiction. *Id.* at 3. Nevertheless, even

these employees are subject to discharge if they do not agree to participate in a rehabilitation program. *Id.*

The legislative history of the ADA confirms that such voluntary wellness programs "often include medical screening for high blood pressure, weight control, cancer detection, and the like." H.R. REP. NO. 101-485, pt. II, at 75. Moreover, this Congressional report indicates such information gathered from these programs was not to be used for the purpose of "preventing occupational advancement." *Id.* Because the EEOC's interpretation of "voluntary" in the Enforcement Guidance as a term that precludes adverse employment consequences for non-participation is consistent with the legislative history, it is provided the appropriate deference pursuant to *Skidmore* for this limited inquiry. Accordingly, the fact that refusal to participate precipitates adverse employment consequences demonstrates this testing program is not compliant with § 12112(d)(4)(B).

The assertion that the testing program was "voluntary" because both the employees and the USW approved the BLA, which explicitly authorizes the testing, misses the point. A test-or-be-fired approach is simply the very definition of coercive and cannot be considered voluntary. Furthermore, there is case law support for the proposition that a labor agreement may not prospectively waive or alter the substantive protections codified in federal civil rights law. *See, e.g., 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("a substantive waiver of federally protected civil rights will not be upheld") (citations omitted); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("there can be no prospective waiver of an employee's rights under Title VII"). The attempt to frame this program as a voluntary health initiative is thus unconvincing.

### 4.   There are No Conflicting Federal Law Obligations

The Court also finds U.S. Steel's second alternative argument unpersuasive.   The regulations implementing the ADA include a defense for employers who can show that the genesis for the challenged action was a conflicting federal law or regulation:

> Conflict with other Federal laws.  It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part.

29 C.F.R. § 1630.15(e).  U.S. Steel identifies two sources of competing federal obligations: (1) compliance with the Occupational Safety and Health Act ("OSHA") and its accompanying regulations, as well as (2) compliance with various federal environmental laws, such as the Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and the Clean Air Act ("CAA"). (Docket No. 228, at 24).

First, U.S. Steel references the OSHA, which generally requires employers to "furnish to each of [its] employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [its] employees." 29 U.S.C. § 654; *see also Babcock & Wilcox Co. v. OSHRC*, 622 F.2d 1160, 1164 (3d Cir. 1980) (reciting the general duty clause from § 654).  As the Third Circuit recognized in *Brennan v. OSHRC*, "the general duty clause imposes a statutory duty to attempt to prevent hazardous conduct by employees." 502 F.2d 946, 951 (3d Cir. 1974).  At a minimum, employers must therefore show that they implemented "demonstrably feasible measures" that "would have materially reduced the likelihood that such misconduct would have occurred" to escape liability under the OSHA. *Id.* at 952.

45

U.S. Steel contends that employee alcohol use is imminently foreseeable "hazardous employee conduct."  It also points out that regulations implementing the OSHA set forth practice controls for the charging, coking, and pushing processes at the coke plant, and that probationary employees are expected to carry out these specific practice controls.  (Docket No. 228, at 25-26).  Given that probationary employees are assigned such safety-sensitive functions essential to eliminating hazards in the workplace, U.S. Steel contends that the OSHA's general duty clause and regulations effectively obligate them to enforce random drug and alcohol testing of probationary employees.  (Docket No. 228, at 25) (citing *Babcock*, 622 F.2d at 1165).

U.S. Steel also claims that it relies on probationary employees to carry out functions critical to environmental compliance.  Specifically, probationary employees dispose of sludge from coking operations and play a role in controlling hazardous coke oven emissions in accordance with RCRA, CERCLA, and the CAA.  (Docket No. 228, at 26-27).  Without the ability to detect and deter intoxication among the probationary employees, the company concludes that it cannot maintain environmental compliance.  *Id.* at 27.  However, U.S. Steel cites to no law that requires them to use probationary employees for any of these compliance-critical jobs.  Nor does it cite to any law that requires them to conduct random alcohol tests on probationary employee.

Employers are not met with inconsistent federal obligations simply because they choose to place themselves in a position in which they cannot comply with all applicable regulatory laws.  In other words, they cannot claim to be trapped between a rock and a hard place when they have not shown that there are no other alternative measures they can take to ensure compliance.  Were employers able to circumvent the ADA prohibition on medical testing by placing selected employees in compliance-critical positions, the exception in 29 C.F.R. § 1630.15(e) would

effectively swallow the statutory rule.  U.S. Steel could have opted to limit work on safety and environmentally sensitive positions to regular employees.  Because the company has not shown that it was subject to inconsistent federal obligations, the alcohol testing policy is not justified pursuant to 29 C.F.R. § 1630.15(e).

### V.    CONCLUSION

Based on the foregoing, U.S. Steel's motion for summary judgment [227] is GRANTED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   February 20, 2013
cc/ecf:  All Counsel of Record